UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS BOREN,

        Petitioner,

                                                            File No. 1:10-CV-562

v.

                                                            HON. ROBERT HOLMES BELL

CONTINENTAL LINEN SERVICES, INC.,

        Respondent.
                                         /

## **O P I N I O N**

This matter comes before the Court on Petitioner Dennis Boren's petition on behalf of the National Labor Relations Board ("NLRB"), for interim injunctive relief pursuant to NLRA § 10(j) requiring Respondent to: (1) allow the Chicago Regional Midwest Joint Board, Workers United/SEIU ("Joint Board") access to Respondent's plant and employees to process grievances; (2) bargain with the Joint Board in good faith; and (3) provide information for contract negotiations. (Dkt. No. 1.) For the reasons that follow, this petition will be granted in part and denied in part.

### I.

Until 2004, Local 151 was the undisputed exclusive bargaining representative for Respondent, Continental Linen Services, Inc. (CLS). Following a series of mergers, Local 151 merged with the affiliation of the Union of Needle trades, Industrial and Textile Employees ("UNITE") and the Joint Board in 2002. Shortly after 2004, Local 151

effectively became defunct. In the meantime, Joint Board representatives, on behalf of the Joint Board/UNITE affiliation, negotiated and signed the 2005-2010 bargaining agreement and administered it on a day-to-day basis. However, when the Joint Board disaffiliated with UNITE in early 2009, CLS barred Joint Board representatives from its premises and refused to bargain for a new collective bargaining agreement, claiming that it would not let any union onto its premises until the Joint Board and UNITE decided who was CLS's NLRA § 9(a) exclusive representative.

As a result, the Joint Board filed charges with the NLRB on August 6, 2009, February 8, 2010, and March 17, 2010, alleging, inter alia, that CLS was engaged in unfair labor practices in violation of NLRA §§ 8(a)(1) and (5). (Dkt. No. 1.) These allegations were consolidated by the NLRB's Regional Director and heard before an administrative law judge of the NLRB on April 13, 2010. *Cont'l Linen Servs., Inc.*, Nos. 7-CA-52296, 7-CA-52715, and 7-CA-52798 (NLRB filed Apr. 13, 2010). Petitioner filed this petition on June 11, 2010. (Dkt. No. 1.)

## II.

Section 10(j) of the NLRA authorizes district courts to grant preliminary injunctions pending the NLRB's adjudication of unfair labor practice cases. 29 U.S.C. § 160(j). However, in carrying out their analysis, district courts are not authorized to adjudicate the merits of unfair labor practice cases. *Fleischut v. Nixon Detroit Diesel*, 859 F.2d 26, 28 (6th Cir. 1988) (citing *Levine v. C & W Mining, Inc.*, 610 F.2d 432, 435 (6th Cir. 1979)). To award injunctive relief:

> [T]he district court must make two findings. First, the court must find there is "reasonable cause" to believe that the alleged unfair labor practice has occurred. Second, if such reasonable cause is found to exist, the court must then determine whether injunctive relief is "just and proper."

*Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 212 (6th Cir. 1995). It is important to clarify that the Sixth Circuit "has consistently used the 'reasonable cause/just and proper' standard" for § 10(j) injunctive relief, unlike other circuits which have "instead adopt[ed] the 'traditional' test."[1] *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 235-36 (6th Cir. 2003) (internal citations omitted).

To determine if "reasonable cause" exists, a district court must resolve a question of law and a question of fact. *Ahearn,* 351 F.3d at 234; *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union 80*, 927 F.2d 926, 928 (6th Cir. 1991). The question of law is whether a legal theory exists that is "substantial and not frivolous." *Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1406, 1407 (6th Cir. 1992); *Fleischut*, 859 F.2d at 29; *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987). However, a petitioner "need not convince the court of the validity of [his] theory of liability." *Frankel*, 818 F.2d at 493. The second question is whether there is evidence in support of the petition. This is a "'relatively insubstantial' burden in that [a petitioner] need not prove that an unfair labor practice had occurred, but must only produce some evidence in support of the petition." *Id.* (citing

---

[1] The traditional test consists of four prongs: (1) whether the moving party has a substantial or strong likelihood of success on the merits; (2) whether the moving party would otherwise suffer irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether a preliminary injunction would serve the public interest. *Ahearn*, 351 F.3d at 234 (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). *Ahearn* explicitly disagrees with applying this test to § 10(j) petitions. *Id.*

*Levine v. C & W Mining, Inc.*, 610 F.2d 432, 435 (6th Cir. 1979)). "[A] district court 'need not concern itself with resolving conflicting evidence if facts exist which could support [a petitioner's] theory of liability.'" *Kobell*, 965 F.2d at 1407 (quoting *Fleischut*, 859 F.2d at 29).

To determine if a preliminary injunction is "just and proper," "the legal standard a district court must apply is whether such relief is 'necessary to return the parties to status quo pending the [NLRB's] proceedings in order to protect the [NLRB's] remedial powers under the NLRA, and whether achieving status quo is possible.'" *Id.* (quoting *Frankel*, 818 F.2d at 495). "The district court, however, must be careful that the relief granted is not simply functioning as a substitute for the exercise of the [NLRB's] power." *Fleischut*, 859 F.2d at 29 (citing *Frankel*, 818 F.2d at 494). While the Third Circuit has introduced the idea that "a premise underlying section 10(j) may be the understanding that 10(j)'s use is reserved for extraordinary cases," the Sixth Circuit has questioned "whether this implicit premise is actually present given Congress' use of the less than stringent 'just and proper' standard." *Fleischut*, 859 F.2d at 30 n.4.[2]

---

[2] Respondent mischaracterizes *Fleischut* as supporting the Third Circuit's decision to reserve 10(j) injunctions for extraordinary cases, which is espoused in *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1091 n.26 (3rd Cir. 1984). (Dkt. No. 15, at 13.) *Fleischut* actually criticizes this decision in *Kobell*.

# III.

## A. Reasonable Cause

Petitioner's legal theory is that Local 151 transferred its § 9(a) representative status to the Joint Board/UNITE affiliation and that the Joint Board retained that § 9(a) status after disaffiliation from UNITE. This legal theory is "substantial and not frivolous," regardless of its validity. It is agreed that Local 151 was the exclusive representative of Respondent prior to the 2005 collective bargaining agreement. (Dkt. No. 2, Attach. B, Jt. Ex. 26, Stip. ¶ 1; Barb Lipsey Test. 151-52.)[3] However, while a "representative may delegate its duties under a contract, it cannot delegate its responsibilities." *Goad Co.*, 333 NLRB 677, 680 (2001). "[L]iab[ility] for the acts of subordinates" is an impermissible responsibility to delegate. *See Reading Anthracite Co.*, 326 NLRB 1371 (1998). If a transfer of bargaining responsibility occurs, in violation of § 9(a), there is a six-month window to challenge the validity of the transfer: "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." NLRA § 10(b).

Petitioner has introduced evidence in support of his theory, satisfying his "relatively insubstantial" burden. Despite the fact that Local 151 "handled everything ourselves before UNITE come [sic] in and merged with our union," Local 151 did not negotiate the 2005

---

[3] Cited attachments A, B, C, and D are found in Dkt. No. 2. Attachment A is testimony from the hearing before the NLRB, Attachment B includes joint exhibits and general counsel exhibits, and Attachments C and D are CLS employee affidavits.

5

collective bargaining agreement nor take any part in administering it on a day-to-day basis.[4] (Lipsey Test. 147, 158-161.) Rather, representatives of the Joint Board handled all of the responsibilities. (*Id.*) Local 151 also no longer held membership meetings, conducted elections for officers, or possessed a bank account or funds. As Local 151 essentially ceased to exist, it could not have retained its responsibilities. As the Joint Board/UNITE affiliation was carrying out Local 151's former functions, it could be considered the successor to Local 151's duties and responsibilities.

While Respondent was not officially made aware of this transfer, Petitioner argues it was constructively aware, at the very latest in 2007 when it signed an agreement to reaffirm the collective bargaining agreement which did not mention Local 151, and which Local 151 representatives played no role in negotiating and signing. (Jt. Ex. 8; Monje Test. 68.) While Respondent is correct that contractual language alone cannot support the replacement of a recognized bargaining representative, the language of that reaffirmation agreement coupled with the fact that Local 151 went from negotiating and administering collective bargaining agreements to handling virtually nothing in 2005 is "some evidence" that CLS was aware. (Dkt. No. 15, Br. in Opp'n to Pet. 19-20.)

There is also evidence that following the Joint Board's disaffiliation from UNITE, the Joint Board retained its § 9(a) representative status. Following the affiliation or

---

[4]Lipsey would occasionally file a grievance which she would turn in to the Joint Board who then handled it, but this was an activity that she declared "even a union steward does." (Lipsey Test. 172-73.)

6

disaffiliation[5] of an exclusive bargaining representative, "the Board cannot discontinue that recognition without determining that the affiliation raises a question of representation." *NLRB v. Fin. Employees Local 1182 (Seattle-First)*, 475 U.S. 192, 202-03 (1986). To determine if there is a discontinuity of representation between the old and new bargaining representative, the Court must consider three factors: (1) continued leadership responsibilities by existing union officials; (2) perpetuation of membership rights and duties, the dues/fees structure, frequency of membership meetings, and the continuation of the manner in which contract negotiations, administration, and grievance processing are effectuated; and (3) the preservation of the union's physical facilities, books, and assets. *W. Commercial Transp., Inc.*, 288 NLRB 214, 217 (1988).

Petitioner has introduced evidence that the leadership of the Joint Board after its disaffiliation from UNITE and subsequent affiliation with Workers United remained unchanged. (Monje Test. 71-72.) Similarly, there was no change in membership rules, dues levels, or in the governing documents of the Joint Board, other than an amendment to the Joint Board's constitution which deleted references to UNITE. (*Id.* at 69.) The Joint Board's main office remained at the same location in Chicago, and while the location of the office in Detroit changed, the Joint Board still maintained a Detroit office. (*Id.* at 73-74.) Furthermore, the future relationship between CLS and the Joint Board would remain largely unchanged because, as the parties stipulated, it had been representatives of the Joint Board

---

[5]While the principles stem from affiliation cases, they are also applicable to disaffiliation. *Canterbury Villa*, 282 NLRB 462, 464-65 (1986).

who negotiated the 2005 collective bargaining agreement, conducted the ratification vote, administered the agreement on a day-to-day basis, received union fees and dues, investigated and processed grievances, met with Respondent's human resources manager, and appointed stewards and members of the bargaining committee. (Jt. Exs. 7, 26; Monje Test. 60-68; Lipsey Test. 154-55, 158-59.) Furthermore, the Joint Board has made efforts to continue this representation even after the disaffiliation. (Jt. Exs. 13, 15.)

UNITE, on the other hand, cannot claim that its leadership responsibilities have remained unchanged since the disaffiliation because of its complete reliance on the Joint Board to represent and service CLS. As evident in the record, UNITE's own representatives played no role in negotiating or administering the 2005 agreement. To continue as CLS's bargaining agent after the disaffiliation, UNITE would have to introduce CLS to an entirely new staff of representatives. (Monje Test. 60-61, 64-67.) Nor did anyone from UNITE, following its disaffiliation from the Joint Board, show up at Respondent's plant to attempt to represent CLS employees, process grievances, or enforce the collective bargaining agreement. (Sarah Wrubel Test. 44-45.) Respondent cites the nominal President of Local 151, Barb Lipsey's, testimony in an attempt to prove that despite this evidence, "UNITE . . . did everything." (Br. in Opp'n to Pet. 23.) However, Barb Lipsey testified, in this instance and others, that she was mistakenly using the term UNITE to refer to Joint Board representatives because of confusion over the actual affiliation of the representatives. (Lipsey Test. at 156, 166-67.)

8

As Petitioner has a substantial legal theory and has produced evidence in support, he has met his reasonable cause burden.

**B. Just and Proper**

Petitioner first argues that preliminary injunctive relief is just and proper to prevent CLS's employees from losing the benefit of union representation. While the Court is cognizant that a denial of a preliminary injunction could result in harm to CLS's employees, the Sixth Circuit does not consider harm to employees when determining whether a § 10(j) injunction is just and proper. *Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 214 n.5 (6th Cir. 1995) ("[W]e do not consider the degree of irreparable harm to the unions and employees in § 10(j) determinations in this Circuit."). Moreover, the Court is unwilling to speculate that CLS's employees are suffering irreparable harm, especially considering that any unjustified disciplinary action that may occur can be remedied by a later ruling of the NLRB, providing, inter alia, back-pay and injunctive relief. *See Calatrello v. Am. Church, Inc.*, No. 1:05-CV-797, 2005 WL 1389042, at *4 (N.D. Ohio June 9, 2005).

Petitioner also argues that a preliminary injunction is necessary because employee support for the Joint Board is irretrievably eroding as a result of the Joint Board having no presence at the plant. The Sixth Circuit will take into account erosion of employee support, but only for the purpose of assessing whether the NLRB will retain its remedial power. *See Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993) (finding that in the absence of union representation there was a significant danger that employee support would

erode to such an extent that the final remedy which the NLRB could impose would be ineffective) (quoting *Asseo v. Centro Medico del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990)).

In support of his proposition, Petitioner cites an off-site meeting the Joint Board attempted to hold on March 10, 2010, to discuss Respondent's refusal to negotiate a successor contract. The Joint Board handed out flyers encouraging employees to attend the meeting and declaring that Respondent was denying the Joint Board access to the plant and refusing to process grievances. (Gen. Counsel Ex. 9.) Despite handing out these flyers, only six of eighty-four employees showed up. (Dkt. No. 6, Am. Br. of Pet'r 30.) Petitioner attributes this poor turnout to Respondent telling employees that "everything on the flyer was all lies." (Attach. C, Charles Hunter Aff. 3-4.) The Joint Board has also introduced affidavits from employees stating that Respondent threatened to fire anyone caught with the union flyer or passing it out. (*Id.* at 2; Attach. D, Robert Kurtycz Aff. 2.) There is also uncertainty among the employees over whether they even have a union, and some have indicated their belief that the Joint Board is a "fake union" that is "just taking our union dues." (Kurtycz Aff. 4.)

It is true that there is no evidence that these employees would be unwilling or unlikely to support the union if the NLRB determines that recognition was illegally withdrawn. *See Am. Church, Inc.* 2005 WL at *4. However, "Congress passed § 10(j) upon finding that . . . the Board's remedial powers are not always sufficient to overcome the passage of time." *Glasser v. Heartland - Univ. of Livonia, MI, LLC*, 632 F. Supp. 2d 659, 673 (E.D. MI 2009).

If a threat of irreparable erosion of employee support exists, an injunction is necessary to ensure that the NLRB's final remedy is effective:

> There was a very real danger that if [the employer] continued to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees. At that point, any final remedy which the Board could impose would be ineffective.

*Asseo*, 900 F.2d at 454 (quoted in *Frye*, 10 F.3d at 1226-27). While the Court recognizes that Petitioner's evidence is not conclusive, it is enough to warrant the issuing of a preliminary injunction. *See Calatrello v. Carriage Inn,* No. 2:06-CV-697, 2006 U.S. Dist. LEXIS 80918, at *23 (S.D. Ohio Nov. 6, 2006) (finding that an employee's testimony constituted "some evidence that erosion of Union support may have occurred and/or is occurring" which was enough for the court to find injunctive relief just and proper).

In response, Respondent argues that the Joint Board's current limited support is a result of it never having the support of employees in the first place. (Br. in Opp'n to Pet. 28-29.) The Court's ability to issue a preliminary injunction to prevent erosion of support is contingent on a finding of prior employee support:

> Upon finding reasonable cause to believe that unfair labor practices have occurred a district court may grant injunctive relief, including an interim bargaining order, upon a further finding that, *at some point, a union had majority support* which the unfair labor practices threatened to erode during the normal process of Board determination and court enforcement.

*Levine v. C & W Mining Co.*, 610 F.2d 432, 436 (6th Cir. 1979) (emphasis added). Respondent cites an affidavit of Barb Lipsey who avers that no union meetings have occurred since 2005, other than the meeting on March 10, 2010. (*Id.*, Attach. 2, Lipsey Aff. ¶ 5.)

11

However, a lack of union meetings does not indicate a lack of employee support. The acceptance of the 2005-2010 collective bargaining agreement makes it clear that there was majority support for union representation. Moreover, every indication is that there was majority support for the Joint Board to, at a minimum, act as a union agent. Therefore, while the Court makes no ruling regarding whether the Joint Board or UNITE is the § 9(a) representative, it deems a preliminary injunction appropriate to preserve employee support for union representation in general. However, the Court is hesitant to grant a preliminary injunction that does more than is necessary to retain the NLRB's remedial powers.

Before issuing an injunction, the Court must also determine whether achieving the status quo is possible. In this case, allowing Joint Board representatives access to the plant will return the status quo that existed before CLS refused to recognize the Joint Board, which was, "representatives of the Joint Board administer[ing] the collective bargaining agreement on a day-to-day basis." (Jt. Ex. 26, ¶ 8.) Forcing CLS to bargain with the Joint Board, on the other hand, would not be a return to the status quo and would give the Joint Board an unfair advantage should the NLRB ultimately decide the dispute with an employee election. Moreover, the Court is especially reluctant to enter an order to bargain, because such an order may cause significant financial burden to Respondent.

## C. Conclusion

While the Court is hesitant to enter into a dispute that is in the NLRB's domain, it is compelled to make a decision as a result of the NLRB's lack of alacrity in issuing a ruling

on a matter that demands haste. In doing so, the Court reminds the NLRB of the requirement to "expedite its administrative action after obtaining a temporary injunction." *Levine v. C & W Mining Co.*, 610 F.2d 432, 437 (6th Cir. 1979). If the NLRB fails to expedite its action, it risks the "temporary injunction, entered without reaching the ultimate merits of [the] dispute [becoming], in effect, a final disposition of the controversy." *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 144 (3d Cir. 1975) (quoted in *Id.*).

The Court is also hesitant to issue the extraordinary remedy of a preliminary injunction in a non-emergency situation. Nevertheless, as established *supra*, the Sixth Circuit does not reserve § 10(j) relief for extraordinary cases, and only requires a petitioner to meet the lesser burden of showing that reasonable cause exists and that the remedy is just and proper.

As a result of its analysis, the Court finds that Petitioner has met his burden of establishing reasonable cause that an unfair labor practice has occurred. The Court further finds that it is just and proper to issue a limited preliminary injunction requiring CLS to allow Joint Board representatives access to their employees and plant to process grievances and represent employees, under the terms of the 2005 collective bargaining agreement. However, the Court does not find it just and proper to require CLS to bargain with the Joint Board or provide information for contract negotiations. Nor will dues have to be paid to the Joint Board; these dues may be kept in escrow until the NLRB issues its decision.

For the reasons stated herein, Petitioner's petition is granted in part and denied in part.

An order consistent with this opinion will be entered.


Dated: July 23, 2010                                          /s/ Robert Holmes Bell
                                                                                  ROBERT HOLMES BELL
                                                                                  UNITED STATES DISTRICT JUDGE